### THREATT v. BREWER MINING CO.

1. PLEADING—CAUSE OF ACTION—DAMAGES.—A complaint for damages and injunction, which alleges several elements of damage, states but one cause of action.

2. DAMAGES—EVIDENCE—WATERS—FISH.—In an action for damages for defiling the waters which run through plaintiff's lands, he may show that the debris dumped in them kill the fish, but the defendant

cannot show that fish have been seen in the stream since suit brought.

3. PRESCRIPTION—WATERS—EVIDENCE.—There was no testimony in this case to show a right in defendant by prescription to dump its debris into the stream.

4. DAMAGES—PUBLIC ROAD—NUISANCE.—A party cannot recover damages for obstructing a neighborhood road (public road), unless he shows that he suffers special damages not common to the public.

5. MINING—DAMAGES—WATERS.—A mining company using the chlorinating process, and permitting its detritus and tailings to run down a stream on the lands of an owner below, which detritus destroys the fertility of the soil, fills up his ditches, and thereby overflows his other lands, and throws a bad smelling deposit on his lands, is liable in damages for the former for the actual depreciation in value of the lands from the commencement of the deposit until suit brought; but for the latter, the jury may find any reasonable compensation.

6. DAMAGES—SULPHUROUS GASES.—The damages to plaintiff from sulphurous gases, at his home, a mile or more from the mine, is hardly worth considering.

7. IBID.—EQUITY—INJUNCTION — NUISANCE. — A Circuit Judge may grant, without trial, on the equity side of the Court, a perpetual injunction against a nuisance, which the jury has found to exist by its verdict for damages, where the defendant sets up no equitable defense.

Before WATTS, J., Chesterfield, January, 1896.   Reversed.

Action by Miles Threatt against Brewer Mining Company, for damages and injunction. The jury found verdict for plaintiff for $1,000. The following is the decree on the equity side:

This cause came on for trial before me at the special term of Court in January, 1896, held for said county, and the issues as regarded the alleged nuisance and damages were duly submitted to a jury on the law side of the Court. The verdict was in favor of the plaintiff for $1,000 damages. During the progress of the case it was conceded by counsel that, pending this suit, the Brewer Mining Company had been sold out, and a new company organized; that Emanuel Motz was the superintendent and general manager of the Brewer Mining Company, and also the superintendent and general manager of the present company—I think this was also testified to, but am not certain, as I have not the testi-

mony before me; these facts were conceded at various times in the argument of counsel representing the defendant, but they repudiated any suggestion that they represented the reorganized company.   On the coming in of the verdict, a motion was immediately made for the injunction craved by the complaint against the defendant, any one claiming under the defendant, *pendente lite*, to abate the nuisance which had been established by the verdict of the jury.   I ordered the case transferred to Docket No. 2, in order to properly entertain said motion, and heard arguments for and against the injunction.   The jury having established the legal right by their verdict, in which finding I concur, it appeared to me proper to grant the motion, and abate the said nuisance by the restraining order of the Court, and that an injunction should be granted, not only against the defendant, but also against any person or corporation claiming under the defendant, *pendente lite*.   It would be putting the plaintiff to unnecessary delay in securing protection to his property, rights, and easements, and encouraging a multiplicity of suits, to require him to again establish by the verdict of a jury the nuisance as against the new organization, claiming under the defendant.   If a Court of Equity is powerless to grant this relief, and sends the plaintiff back to the law side of the Court to re-establish his legal right, then it would be possible for the new organization to sell out, before the verdict in the regular course of procedure could be procured, to a third person or corporation, and so on indefinitely; thus defeating him in procuring the relief which the verdict of a jury has already shown him to be entitled to.   Before I had announced my decision, I was requested by counsel for plaintiff to withhold my decision, pending negotiations for a settlement, as they and defendant's counsel had agreed to make this request, which I did; and the plaintiff's counsel having notified the counsel of defendant that the time given for said negotiations having expired, I would be requested to file my decision in the premises, on the 14th April, in-

7—49

stant, at 12 o'clock m.    I, therefore, now decide to grant the motion, and it is

Ordered, that the defendant, its agents, servants, and all persons or corporations claiming under the defendant, their agents and servants, be, and they hereby are, enjoined and restrained from doing or carrying on the acts and operations, or any of them, alleged in the complaint in this action, and from operating or maintaining any of the works described in the complaint, whereby further injury may result to the plaintiff, his family, home, property, easements, and privileges, alleged in the complaint; and that the nuisance alleged in the complaint be forever abated and stopped, and that the prayer of the complaint, craving an injunction, be granted.    Ordered, further, that this decree be forthwith filed in the office of the clerk of court for Chesterfield County, and that said clerk do make and deliver to the sheriff of this county certified copies of this decree, to be served by him upom Emanuel Motz, general manager, or upon any one in the possession, control or management of the Brewer Mining Company, by whatever name same may now be called.

The defendant excepts to the rulings and charge of the presiding Judge, and to his order or decree granting an injunction, and moves the Supreme Court to reverse the judgments and decrees of said Court, upon the following exceptions:

1. Because his Honor erred in holding, upon the motion made by the defendant to require the plaintiff to elect upon which cause of action stated in the complaint he would rely, that there was but one cause of action stated.

2. Because his Honor erred in overruling the motion of the defendant, to require plaintiff to elect upon which cause of action stated in the complaint he would rely, and in further holding that the plaintiff had stated but one cause of action, when the plaintiff had stated in his complaint at least seven alleged causes of action, to wit: first,

a cause of action in making his home unpleasant to him-
self and family, by filling his dwelling with fumes from
burning sulphurets, and noxious effluvia engendered and
set free in the atmosphere by the roasting process—this
being a cause of action for rendering his air foul and im-
pure over and round his residence by means of the roasting
process; second, a cause of action for destroying the fertility
of about eight acres of rich bottoms or rich bottom land, so
that no vegetation nor crops will or can grow thereon, by
reason of depositing detritus and tailings charged with dele-
terious chemicals and substances in Little Fork Creek, to
be carried by freshets on to plaintiff's land—this being a
cause of action for destroying the fertility of a part of plain-
tiff's rich bottom lands; third, a cause of action for injuring
and poisoning the waters of Little Fork Creek, so that his
stock could not drink the same, by turning into said creek
detritus and tailings, and deleterious chemicals and sub-
stances—this being a cause of action for rendering his
water foul and impure as it flows over his land; fourth, a
cause of action for killing or driving the fish from Fork
Creek, by reason of the impurities or poisonous deleterious
chemicals placed in said creek—this being an alleged in-
jury to his alleged personal property; fifth, an alleged cause
of action for the obstruction of two neighborhood roads—
this being a cause of action to his alleged right of way;
sixth, a cause of action for rendering the atmosphere over
his roads and farm unpleasant and offensive to himself,
family, and laborers, by reason of the sickening stench aris-
ing from the accumulations of detritus or tailings, and the
deleterious chemicals and substances contained therein—
this being a cause of action for rendering the air over his
farm and rights of way foul and impure by means of detri-
tus tailings and poisonous chemicals; and seventh, a cause
of action for filling up his ditches with detritus and tail-
ings—this being an action for injury to his improvements.

3. Because the complaint did not state facts sufficient to
constitute a cause of action for damages on account of injury

to fish or fishing rights, and his Honor erred in allowing any evidence to be .offered to prove this alleged cause of action, after objection was made.

4. Because his Honor erred in allowing plaintiff to offer any evidence to show that he had sustained damage by reason of the fish in Fork Creek being killed or driven from the stream, when there was no allegation in the complaint that the fish belonged to him, or that he had reduced them into his possession or brought them under his control.

5. Because neighborhood roads are public roads, and for their obstruction the remedy is by indictment, and an action for damages for such obstruction cannot be maintained at the suit of a private individual, unless he alleges and proves some special injury to himself by reason of such obstruction. The plaintiff in this case did not allege any special injury to himself by reason of such obstruction. The complaint did not state facts sufficient to constitute a cause of action for this alleged injury, and his Honor erred in allowing evidence to be offered to sustain it, over the objection of the defendant..

6. Because his Honor erred in overruling the defendant's objection to the following evidence given by the witness, W. L. Sowell: "Q. Did you notice the road where it crossed through Mr. Threatt's plantation, where it crossed over that Fork Creek?   A. Yes, there were two roads—   Q. You say you crossed these roads through Mr. Threatt's plantation? A. Yes, sir.   Q. Did you cross there at any time when this debris, this matter from the mine, was accumulated in the roads?   A. Yes, sir, I passed there.   Q. In what condition did you find the road?   A. I found it a little bad to travel; it would be washed up in the banks so it would be bad to get out with a buggy or wagon.   Q. How did that stuff affect the horses in traveling?   A. When it was first washed up there, where it was wet, it would bog; it was very boggy and sticky, the horse could hardly get his foot out; and when it was dry, it was harder; right after the freshet, until it could dry, it seemed to suck, it was hard to get the horse's foot

out of it. Q. How deep in the road was it? A. I do not know how deep; I never passed there when it was very deep; I passed there a time or two when it was, maybe, a foot or less deep. Q. Did you ever see anybody throwing it out of the road? A. I never saw anybody throwing it out, but I saw where it had been thrown out."

7. Because his Honor erred in charging the jury that the plaintiff was not suing for obstruction of a neighborhood road, when the plaintiff had alleged in his complaint that he has "for the same time" (thirty years) "enjoyed the use of two neighborhood roads long since established by prescriptive right, with good, safe, and convenient fords across said creek;" and that "the plaintiff's said roads have been obstructed and interfered with by the deposits therein of the said detritus or tailings, and at each swell or freshet the said fords become impassable, and the accumulations of said detritus or tailings are so deep that it has to be removed before communication across said stream can be effected."

8. Because his Honor, in charging upon plaintiff's first request: "That a neighborhood road is a public road," erred in charging as follows: "That is good law. I charge you, that is good law; but, as I apprehend the case here to be, the plaintiff is not suing for an obstruction of a neighborhood road. He says he has been inconvenienced, he alleges in his complaint, among other things, that he has been inconvenienced in the use of two neighborhood roads that run across his property, by the action of the Brewer Mining Company. So, while that proposition of law is sound, yet I do not see where it can apply in this case. For he is not suing the Brewer Mining Company here nor indicting them for obstructing this road, but he alleges, and has attempted to prove, that he has suffered inconvenience from this Brewer Mining Company by reason of said deposits being put in his road." The defendant respectfully submits, that this was equivalent to charging the jury that they could find damages for the obstruction of a neighborhood road.

9. Because his Honor erred in refusing to charge plain-

tiff's second request, which was as follows: "That for the obstruction of a public road the plaintiff cannot maintain an action for damages in this Court, unless he has alleged and proved that he has sustained some special injury by such obstruction."

10. Because his Honor erred in refusing defendant's second request to charge, and in charging thereon as follows: "That is good law, too, but the plaintiff is not suing here for any special damage by reason of the obstruction of the road; he has filed his complaint to abate a nuisance; that this defendant has been operating its property in such a manner as to create a private nuisance; that it is a nuisance to him; that he has been injuriously affected, and that he is entitled to damages." The defendant respectfully submits that this was not only a refusal of plaintiff's request, but a charge to the jury that they could find damages for such an obstruction, whereas he should have charged the jury as the defendant requested.

11. Because his Honor erred in refusing to charge defendant's third request, which was as follows: "That in this case the plaintiff has not alleged any special act of injury to himself by the obstruction of the two neighborhood roads, and for their obstruction he cannot recover damages," and in charging upon said request, as follows: I refuse to charge you that. I do not think that that is the law of this case.

12. Because his Honor refused to charge defendant's thirteenth request, which was as follows: "That a neighborhood road is a road that has been used and traveled by the neighborhood and the public generally for twenty years; if the plaintiff has not proved that the roads alleged in his complaint to be neighborhood roads by prescription, have been used and traveled by the neighborhood and public generally for twenty years; then he has failed to establish this allegation in his complaint," and in charging thereon as follows: I refuse to charge you that.

13. Because his Honor erred in charging the jury, the

complaint in substance states, among other things, "that the water has been so tainted and polluted by this defendant's putting certain chemicals and substances in the water that fish would not grow in there, and his fishing rights have been destroyed."

14. Because his Honor erred in charging the jury that the complaint in substance states that the fumes, odors, and scents from the mill are noxious, and interfere with the comfort of himself, and his family, and servants, and render his residence not a good place to live at; that he experiences serious discomforts from them."

15. Because his Honor erred in charging the jury that there was no competent relevant testimony to go to them on the issue of an easement, which had been raised by the answer of the defendant.

16. Because his Honor erred in charging the jury as follows: "They (defendant) also allege that they are entitled to the use of this creek there by reason of an easement— that is, that they have a prescriptive right, having had twenty years or more enjoyment of the right. Now, ordinarily, I have nothing to do with the testimony in the case, but where there is no testimony to go to the jury at all, it is not only the province but the duty of the Judge to instruct the jury on that point. I, therefore, charge you, as a matter of law, that there is no competent relevant testimony to go to you on that point. So that is to be eliminated from your consideration of the case entirely. There is no competent proof in the case that defendant used that stream for twenty years, or any one under whom he claimed by written deed, used it for twenty years. So that you will not consider that question in your deliberations—that is, that he had the right to use this stream, having used it for more than twenty years. There is no testimony competent to go to you on that point alone."

17. Because his Honor erred in charging the jury that: "If they (the defendant) * * * polluted or tainted that stream so that he could not catch any fish—so that fish would not

run in there for him to catch—and so injured this defendant and his property, then they (meaning defendant) would be liable for damages."

18. Because his Honor erred in charging the jury: "If his land (plaintiff's) has been injured, and the defendant was the cause of the injury in whole or in part, then he is entitled to damages.  It does not matter whether all of this injury came from the Brewer Mine or not, but if they assisted in it, helped to do it, then the plaintiff is entitled to recover."

19. Because his Honor erred in charging the jury that: "It is for you to determine whether that land has been rendered useless, whether vegetation has been destroyed, whether anything will grow on it.  If you conclude that it has been so injured, and the Brewer Mine is responsible for it in whole or in part—that is, if they assisted in it—then he would be entitled to recover whatever damages have been established under the testimony here;" whereas he should have charged the jury that they could find no more damages against the defendant than the plaintiff had proved by the preponderance of the evidence that the defendant had committed.

20. Because his Honor erred in charging the jury that the defendant would be liable for whatever damages plaintiff had sustained, if the defendant assisted, aided, and abetted in the injury; when there was no evidence showing, or tending to show, that the defendant aided, abetted or assisted any one else to commit any injury upon the plaintiff. There was abundant evidence showing, and tending to show, that the plaintiff was injured, if injured at all, by natural causes, and by other parties who had been engaged in hydraulic mining at the tan yard and on Bull Gulch before the defendant erected its mill and began operating it; and his Honor's charge was misleading to the jury, and was, in effect, an instruction to the jury that, if they should conclude that the defendant, by its operations, did some of the damage to the plaintiff, and the parties who had at one

time been engaged in hydraulic mining at the tan yard and on Bull Gulch did a part of it, or a part of it occurred from natural causes, then the defendant was liable for all the injuries thus sustained, on the ground that the defendant assisted in committing the injury.

21. Because there was no evidence in this case to show that the defendant ever assisted, aided or abetted any other party to commit any of the alleged injuries to the plaintiff, and, for this reason, his Honor's charge upon the question of the defendant's aiding, abetting, and assisting to commit the alleged injuries to the plaintiff, was misleading to the jury; and his Honor's charge was further misleading in this, that he did not explain to the jury what he meant by aiding, abetting, and assisting; thereby leaving that matter for the determination of the jury, which was a question of law.

22. Because his Honor erred in refusing to charge plaintiff's fourth request, which was as follows: "That the defendant had a right to use the water in Little Fork Creek in a reasonable manner upon its own premises; and if the defendant in using the water made it muddy, the plaintiff cannot recover damages for such acts, unless he has alleged and proved some actual injury by the water being made muddy."

23. Because his Honor erred in charging upon plaintiff's fourth request as follows: "I do not charge you that exactly in those words. I have already charged you, and I will repeat it now, that this defendant here had the right to use his property as he pleased; but if by that use he damaged his neighbor, the plaintiff in this case, then the plaintiff in this case is entitled to recover damages. It is for you to say, under all the testimony in the case, whether or not he has muddied or polluted that water, and whether he has injured this plaintiff in the manner he claims. Ordinarily the muddying of water would not, I should think, be such grounds for damages as would entitle a man to recover; but you take into consideration all the testimony in this case.

It is for you to say whether there was anything done to his water as to injuriously affect the plaintiff in this case." The defendant submits that his Honor's charge practically left it to the jury to determine for themselves whether they would find damages against the defendant for muddying the water in that creek, without regard to the fact whether the plaintiff had sustained any real injury or not; whereas he should have explained to the jury, at least, for what acts of the defendant the plaintiff was entitled to recover damages.

24. Because his Honor erred in refusing to charge the defendant's sixth request, which was as follows: "That the plaintiff cannot recover damages on account of the smoke, fumes or noxious effluvia which issued from the furnace of the defendant's mill, unless he has satisfied the jury, by the preponderance of the evidence, that he or his family or servants have sustained some actual injury in person or property by such smoke, fumes or noxious effluvia."

25. Because his Honor erred in charging as follows upon defendant's sixth request: "I refuse to charge you that. It is not necessary that he should sustain actual injury. If he has been inconvenienced or made uncomfortable, he would be entitled to damages." His Honor should have explained to the jury the meaning of the terms inconvenienced and uncomfortable, whereas he left a question of law to be determined by the jury.

26. Because his Honor erred in charging the jury that the plaintiff was entitled to damages on account of the smoke, fumes, and noxious effluvia that issued from the defendant's furnace, if he had suffered inconvenience thereby; when there was no evidence whatever in the case that he had suffered any damage or inconvenience from such causes, and for this reason he should have charged the jury that there was no evidence to go to them on that point, and they need not consider it, and his Honor erred in not so charging.

27. Because his Honor erred in refusing to charge de-

fendant's eighth request, which was as follows: "That the plaintiff must show, by the preponderance of the evidence, that the defendant did put poison in the waters of Little Fork Creek, and that he thereby sustained injury, before he can recover damages upon this allegation in the complaint."

28. Because his Honor erred in charging upon defendant's eighth request as follows, to wit: "I refuse to charge you that. If you are satisfied, from the testimony, that this water was polluted or tainted, or rendered unfit for use for man or beast, or injurious to fish, and drove them out of the stream, and if that was done by the defendant, if the defendant was the cause of that, and this water came from their mill, then, in that event, the plaintiff would be entitled to recover, if any damages have been sustained."

29. Because his Honor erred in refusing to charge defendant's ninth request, which was as follows, to wit: "That if the jury should conclude that the plaintiff's lands have been injured, and that he is entitled to damages for such injury, then the true measure of damages is the difference in the value of the land before and after the injury was sustained."

30. Because his Honor erred in charging the jury upon the defendant's ninth request, as follows: "That is good law, but I do not see exactly how it applies to this case, and for that reason I will not charge it to you in that language. In arriving at the damages in this case, if you conclude that the plaintiff has been damaged by the defendant, then you will take into consideration all of the evidence which convinces you, if it convinces you at all, that he has been damaged, and damaged by the defendant. You will take into consideration all the evidence that bears on the allegations of his complaint, that his land has been injured by these deposits; that the fish had been driven out of these streams; that the air has been rendered impure; the waters polluted; his habitation rendered an unpleasant place for him to live at for himself and family and servants, by rea-

son of this foul, noxious, and poisonous air, if you conclude from the testimony that this is the case. As I said, the testimony is entirely for you, you are the sole judges of that, and you will take all of that into consideration in making up your estimate of the damages in the case. You are not to estimate the damages that has been done to this land alone by these deposits alone; you are not bound to confine yourselves to that; you will take into consideration the whole testimony bearing on all the allegations of the complaint—the actual injury to the land—inconvenience, if that is an element that enters into this case. Has this plaintiff suffered any inconvenience? In addition to actual injury to his land, has his dwelling house been made an unpleasant place to live at? All of that can enter into your estimate in making up your verdict in this case." The defendant submits that this was a refusal of its request to charge; that it left the jury without any rule or standard by which to measure the damages to the land, and was, in fact, an instruction to the jury, that in arriving at the damages to the land, that they might, and should, take into consideration every alleged cause of action set up in the complaint.

31. Because his Honor erred in refusing to charge defendant's tenth request, which was as follows: "That the plaintiff cannot recover damages for any injury that may have been caused by other parties."

32. Because his Honor erred in charging the jury, upon defendant's tenth request as follows, to wit: "As I said before, if you conclude from the testimony that the defendant here did not assist in the injury at all, then your verdict must necessarily be for the defendant; but if the plaintiff here was injured from other causes in part, and part by this defendant here, then it is your duty to find for the plaintiff. If the defendant aided, abetted, and assisted in that injury to the plaintiff, although some other causes came in and helped to injure the plaintiff, still, if he did assist in those damages, then you are to say what damages. You are the

sole judges of the damages in this case, as well as of the testimony."

33. Because his Honor's charge, taken as a whole, is, in substance, this: That if the defendant did some part of the injury complained of, and the remainder of the damages was caused by other parties or from other causes, then the jury should find a verdict against the defendant for all the damages that the plaintiff had sustained from any cause, on the ground that the defendant assisted to commit the injury.

34. Because his Honor erred in refusing to charge the defendant's eleventh request, which was as follows: "That if the plaintiff's lands were wholly or in part injured by other parties running tailings, sand or gravel down Bull Gulch into Fork Creek before the defendant erected its mill and machinery and commenced operating the same, then the plaintiff cannot recover of the defendant damages for such injuries."

35. Because his Honor erred in charging upon plaintiff's eleventh request, as follows: "I refuse to charge you that. I do charge you, that if the piece of land was wholly injured by other parties running tailings or anything else in there, then the plaintiff cannot recover. But if he was injured in part by the defendant here—if you come to that conclusion—then he would be entitled to recover. But if somebody else did the injury, and this defendant did not have anything to do with it—did not injure him in whole or in part, did not assist in injuring him—then, of course, it would be wrong to make the defendant pay for what somebody else had done; but if somebody else was guilty of a part of the injury, and this defendant a part, then the plaintiff would be entitled to damages.

36. Because his Honor erred in refusing to charge defendant's twelfth request, which is as follows: "That if the plaintiff's lands have been injured since the defendant commenced its operations on Little Fork Creek, and such injury has been caused in whole or in part by the breaking of the dam on Bull Gulch, erected by other parties to stop tailings

before this defendant become proprietor, then under no cir-
cumstances can the plaintiff recover damages of the defend-
ant for so much of the injury as was caused by the breaking
of these dams."

38. Because his Honor erred in charging the jury upon
the defendant's twelfth request, as follows: "I refuse to
charge you that in that way. As I have repeatedly said to
you, if other parties injured the plaintiff, and not the de-
fendant, then the plaintiff is not entitled to recover; but if
the plaintiff was injured, and the defendant did that injury,
or if he assisted—if he did part of it—then the plaintiff is
entitled to recover."

38. Because his Honor's charge, taken as a whole, was,
in substance, that if the defendant did part of the injury
complained of, and other parties did the remainder of the
injury, then the defendant is liable for all the damages the
plaintiff has sustained.

39. Because his Honor erred in overruling the defend-
ant's objection, and allowing the following testimony of the
witness, Miles Threatt: "Q. How about the road you have
to cross in going to and from your place, just after these
freshets? A. There were only two roads, only two outlets
from my place; every freshet of any extent at all throws
that out, and the bank is pretty sticky— (Defendant ob-
jects to any testimony as to the condition of the roads.
Objection overruled. Exception noted.) Q. Go on now
and tell us what kind of stuff it was in the road and how
it affected the person trying to get through it? A. It
affected in this way, when we go to make a road we have
to cut down the bank so we can get out; now when the creek
gets up, when it strikes these places, it gushes the stuff into
the ford and it becomes stickey, and if you get into it you
bog. It has a kind of suction, if you get in it you can not
usually get out. I have had to shovel it into the creek. Q.
After every freshet you have to go and shovel it and clean
it out? A. Yes, sir; in fact, people come there that would
go on the opposite side and hitch and walk across the log.

Q. Did you ever have any trouble with it amounting to
serious trouble? (Objected. Objection overruled. Excep-
tion noted.) A. The first bad trouble I got into, I went to
cross it; Captain Vivian was at work at the mine; his wife
staid in Charlotte, and she wanted to get down— (Ob-
jected to.) I was crossing there, going to bring Captain
Vivian's wife's trunk to my half-sister's she was going to
stay with, he and Captain Vivian was right behind me in
his buggy, with my son driving his horse; the creek was
up; I thought we could cross with safety; I had two big,
strong mules and nothing in the wagon, and stuck there;
both mules bogged down, and I commenced hollowing for
help. Q. Did anything happen to you? A. My mules
then looked like they would drown; I was sitting there in
the wagon, and I had to stay until my son from home come
down there; my little son was in the buggy with Captain
Vivian; he ran for my other son; he come, and one of my
daughters. Q. How did they get out? A. He ran there and
cut the mules loose; they were down bogged in that stuff;
they scuffled and got out after he cut them loose. He
brought a shovel and we went to work. When we stuck
there this suction fastened the wheels of the wagon. We
worked, and worked, and the way we had to work was to
gather this and shovel it, and the water carried it off. I
had to wade in there and shovel this off." The defendant
submits that this testimony was incompetent, because irrel-
evant, to prove, or tend to prove, any cause of action stated
in the complaint, because it was designed to prove the
alleged cause of action for the obstruction of plaintiff's
roads, when the complaint does not state facts sufficient to
constitute a cause of action for the obstruction of a right
of way.

40. Because his Honor erred in overruling the defend-
ant's objection, and allowing the following testimony of the
witness, Miles Threatt, because the same was incompetent
and irrelevant to establish any issue raised by the plead-
ings, and was offered to prove plaintiff's alleged cause of

action for injury to his fish and fishing rights, when the complaint did not state facts sufficient to constitute a cause of action for injury to plaintiff's fish and fishing rights: "Q. Before 1890, did you ever fish in it, or did you ever make any arrangements by which you could catch fish in Fork Creek? A. Yes, sir, some. Q. How? A. I generally fished there with a— (Defendant objects to testimony as to fishing. Objection overruled. Exception noted.) Q. You have fished some since? A. No, sir, not since the mine started; I don't think I have wet a hook since then. Q. You took fish from Fork Creek freely up to 1890? A. Yes, sir. Q. Were they plentiful? A. Not large ones, but just nice for hooking; and sometimes we would get very nice suckers—what we call the creek suckers would run up there; we have got some very nice strings. Q. Did your family fish there, too? A. That was the only place they did fish. Q. Do you know, of your own knowledge, of anybody's taking any fish out of there since 1890? (Objected to. Objection overruled. Exception noted.) Q. Well, what do you say? A. I don't know whether they have or not. Q. Have you ever known if anybody ever tried to catch fish out of there since then? A. I don't know if I have; seems like I did see my little boy fishing there when I was at work there. Q. You don't know of any fish being taken out, and you have not tried yourself? A. No, sir."

41. Because his Honor erred in instructing the jury that in making up their estimate of damages they might take into consideration any injury that defendant had done to plaintiff's fish in Fork Creek, whereas he should have instructed the jury that there was no evidence to go to them to show that the defendant had done any damage to any fish or fishing rights of the plaintiff, and that they need not consider that question, there not being a particle of evidence in the case to show that the defendant had in any way injured the fish of plaintiff.

42. Because his Honor erred in overruling the defendant's

objection, and allowing the following testimony of the witness, F. M. Welsh, for the reason that it was the opinion of the witness, and it was the province of the jury to draw conclusions as to the amount of damages from all the evidence in the case, and not the witness: "Q. From these facts now, and the circumstances that you have detailed regarding this injury, what estimate do you put on Mr. Threatt's damages? (Objected to. Objection overruled. Exception noted.) Q. Give me the actual damages, if you please, that he has sustained? A. I could not say exactly; I would think at least one-third of the value of his place. Q. At least one-third the value of his place? A. Yes, sir. Q. Without these troubles—putting his place in the condition it was before any of these troubles came upon it or upon him—what would you say was the value of his property in 1890? A. I could not answer that question intelligently, because I have never seen the whole of it."

43. Because his Honor erred in sustaining the objection to, and ruling out, the following testimony of the witness, J. A. Chisholm, for the reason that it was relevant and competent for the purpose of showing that it was not possible for the smoke, fumes, and alleged noxious effluvia to render the plaintiff's home unpleasant and uncomfortable: "Q. When you lived between Mr. Threatt's and the mine, did you notice any of the fumes from the mill? (Plaintiff objects to any testimony of fumes anywhere else, except on Mr. Miles Threatt's premises.) By the Court: I distinctly ruled on yesterday that it did not matter how it smelled around the mine, on the lands of the Brewer Mining Company; that they must confine themselves as to whether it poisoned the air or smelt offensively on plaintiff's land. (Objection sustained. Exception noted.)"

44. Because his Honor erred in sustaining the objection to, and in ruling out, the following testimony of the witness, J. A. Chisholm, for the reason that said testimony was relevant to show that the land described in the complaint was not so valuable as it was alleged to be, and that it had

8—49

been injured from natural causes, and not by the defendant, as plaintiff had alleged: "Q. You saw that land washed? A. Yes, sir.   Q. Did you include that washed land in the estimate? (Objected to, on the ground that there is no allegation in the answer that that land was injured in any other way.  They cannot show that we have been injured in some other way.)   By the Court: They deny that you have been injured in any way set up in your complaint. They do not say you have been injured in any other way. They allege that, by reason of these deposits on the land, he could not keep his ditches open, and caused overflows from the creek, instead of back water from the river, to enrich it.   You have the right to show the value of the land, but I don't think you can show that the land was destroyed by the washes from the hills, unless you had specially alleged that in your pleadings.  As I understand, you have not set up any definite, affirmative defense.  You have simply contented yourselves with a general denial; you deny that there has been any injury, and, if there was any injury, that the defendant did not cause any injury.  Mr. Kennedy: If you will allow, I will ask a question, in order that my exception may be noted: Q. When you were there on the 30th day of May, 1893, did you or not observe any of this land to be washed away? (Objected to.  Objection sustained.  Exception noted.)"

45. Because his Honor erred in sustaining the objection to, and ruling out, the following testimony of the witness, J. A. Chisholm, because it was relevant under the issue raised by the pleadings for the purpose of showing that the injury complained of was not the act of defendant, but was the consequence of the acts of other parties: "Q. What would you say about those sands on Miles Threatt's lands in comparison with those on Bull Gulch? (Objected to.)   By the Court: I think you are restricted to your general denial; I don't think you can set up a definite, affirmative defense.  Therefore, I sustain the objection.  Q. For the purpose of getting my exception in proper shape, I will

ask the question: From your knowledge of the sands that escape from the dams on Bull Gulch, and the sands that are on Mr. Threatt's lands, would you or not say that any of the sands from Bull Gulch were deposited now on Mr. Threatt's land? (Objected to. Objection sustained. Exception noted.)"

46. Because his Honor erred in sustaining the objection to, and in ruling out the answer to, the following questions asked the witness, Allen Love, it being relevant to disprove the allegation that the fumes and smoke from the defendant's mill made the plaintiff's home unpleasant and uncomfortable: "Q. How far from the mill have you smelled it? (Objected to. Objection sustained.)"

47. Because his Honor erred in sustaining the objection to, and ruling out the answer of, the witness, J. A. Baker, to the following question, the same being relevant to disprove the allegation of the value of plaintiff's lands, as he alleged in his complaint, and to disprove the allegation that plaintiff's lands were destroyed by the mining operation of the defendant: "Q. If that land were covered to the depth of a foot with sand, what effect would it have? (Objected to as an opinion. Objection sustained.)"

48. Because his Honor erred in sustaining the objection to, and in ruling out the answers to, the following questions propounded to the witness, J. A. Baker, they being relevant to disprove the allegation of the complaint, that the defendant had destroyed, by operating its mill, the fish in Fork Creek: "Q. Have you, since May, 1893, fished at the mouth of Fork Creek, in Lynch's River, and if so, have you caught any fish there or seen anybody else catch any fish there? (Objected to.) By the Court: I think that is incompetent, because the allegation of the complaint is, that in 1893 the fish had been destroyed or injured. I do not think that any question as to what took place subsequently to that time— that is, to the commencement of the action—is competent. (Exception noted.)"

49. Because his Honor erred in sustaining the objection,

and in ruling out the answers, to the following questions propounded to the witness, J. A. Baker, the said evidence being relevant to disprove the allegation of the complaint that the defendant injured plaintiff's lands, and to show that said land was injured by other causes: "Q. When there is a freshet in Big Fork Creek, what is the character of the stream? (Objected to.) * * * Q. When there is a large freshet in Big Fork Creek, what effect on these low grounds does it have—when the two creeks get together, does the water of Big Fork Creek keep in the channel or break over the low grounds? (Objected to, on the ground of irrelevancy.) Q. Will it or not run over on Mr. Threatt's low grounds? (Objection ruled incompetent, inasmuch as that is not a definite affirmative defense in the pleading. Exception noted.)"

50. Because his Honor erred in sustaining the objection to, and in ruling out the answers to, the following questions propounded to the witness, D. F. Moore, they being relevant as tending to disprove the allegation of injury to plaintiff's lands: "Q. Can you tell me whether or not the bottom lands on that creek are injured by the overflows of the sand or not? (Objected to, on the ground that the defendants are confined to the damage done by the Brewer Mining Company and this particular piece of land. Objection sustained, and exception noted.)"

51. Because his Honor erred in sustaining the objection to, and in ruling out, the answers to the following questions propounded to the witness, L. E. Gardner, the answers thereto being relevant to disprove the allegation in the complaint that the defendant had destroyed or driven the fish from the creek: "Q. Have you ever been fishing at the mouth of Fork Creek where it empties into Lynch's River? A. Yes, sir, I have been there once. Q. When was it? A. As well as I remember, that was in 1894. (Plaintiff objects, on the ground that it was after the commencement of the action. Objection sustained. Exception noted.)"

52. Because his Honor erred in overruling the defendant's objection to the following evidence given by the witness, John F. Miller, the same being irrelevant to any issue raised by the pleadings: "Q. Isn't it a fact that Mr. Threatt's land and his home without his low grounds, just take his low grounds from his home, it would destroy a large part of the value? (Objected to, on the ground that it is not competent to prove how the damage to this particular property affected the value of the other property, but that the inquiry should be confined to what damage, if any, has been suffered by this particular property. Objection overruled. Exception noted.) Q. If the bottoms were cut off and sold to themseves, what would they bring? A. Twenty-five dollars an acre, I suppose. Q. Suppose you lived in Mr. Threatt's house and had Mr. Threatt's property, then would you take twenty-five dollars an acre for them? (Objected to.) By the Court: This plaintiff claims not only the value of his land, but any injury to the value of his home, and anything that tends to show damage done to the home will be allowed. (Exception noted.) Q. If you had his home and his property, and a neighbor wanted those bottoms, would you cut them off and sell them for twenty-five dollars an acre? A. Yes, I think I would."

53. Because his Honor erred in allowing the witness, William Griffith, in his testimony to give his opinion as to the amount of damages that the plaintiff had sustained.

54. Because his Honor erred in allowing the witness, William Griffith, to testify as to the condition of the two neighborhood roads, described in the complaint; because the complaint stated no cause of action for damage to said roads in plaintiff's favor, and any evidence thereof, for this reason, was incompetent.

55. Because his Honor erred in allowing the testimony of the witness, W. E. Raley, as to the condition and character of the two neighborhood roads, described in the complaint, when the complaint failed to state facts sufficient to constitute a cause of action in plaintiff's favor for damage

to these roads, and any proof thereof, for this reason, was incompetent and irrelevant.

56. Because his Honor erred in allowing the witness, W. E. Raley, in his testimony to give his opinion as to the amount of damages the plaintiff had sustained, whereas the witness should have been required to state facts and circumstances, from which the jury could draw their own conclusion.

57. Because his Honor erred in allowing the plaintiff, Miles Threatt, in his testimony to state his opinion as to the amount of damages he had sustained, whereas he should have been required to state facts and circumstances, from which the jury could draw their own conclusion.

58. Because his Honor erred in allowing the witness, F. M. Welsh, to give his opinion as to the amount of damages the plaintiff had sustained, whereas he should have been required to state facts and circumstances, and leave the jury to estimate the amount of damages.

59. Because his Honor erred in ruling out the evidence of the witness, J. A. Chisholm, as to the condition in which he found the plantation of the plaintiff on the 31st day of May, 1893, the same being relevant to show whether the same was damaged as the plaintiff had alleged in his complaint.

60. Because his Honor erred in granting a perpetual injunction without a trial of the equitable cause of action; if the complaint states such a cause of action, on the equity side of the Court, before the Judge sitting as a Chancellor.

61. Because the defendant has both a constitutional and statutory right to a trial before the Court upon an equitable cause of action, in which the plaintiff is required to show, by proof, that he is without plain and adequate remedy in the courts of common law, and in which the defendant may contest this right, and this trial cannot be refused; and his Honor erred in holding that, after the trial of the legal cause of action, he could, on a mere motion, without a trial of the equitable cause of action, grant a perpetual injunction

62. Because an injunction is not a matter of right, but a matter of grace, and the establishment of a nuisance by the verdict of the jury in a court of common law, or on the law side of the court, as we say now, does not establish the equitable cause of action, or show that the plaintiff is without plain and adequate remedy at common law; and his Honor erred in holding that the verdict of the jury, in a legal cause of action, established the equitable cause of action, and showed the plaintiff to be without plain and adequate remedy at common law, and that, upon such a verdict, he could grant a perpetual injunction without a trial in equity.

63. Because the establishment of a nuisance in an action at common law does not establish the right to an injunction, for there are many nuisances that would sustain an action at law for damages that would not be ground in equity for granting an injunction, and his Honor erred in holding that the establishment of a nuisance by the verdict of a jury entitled the plaintiff, as a matter of right, to an injunction.

64. Because his Honor erred in holding that he could grant an injunction on a mere motion at chambers.

65. Because the complaint in this action did not state an equitable cause of action, and his Honor erred in holding that it did.

66. Because his Honor erred in holding that the evidence received on the trial before the jury was sufficient to establish plaintiff's right to an injunction.

67. Because his Honor erred in holding that the plaintiff was without plain and adequate remedy at common law, and that the verdict of the jury was not adequate compensation, when the verdict of the jury gave him more than the value of the place and every dollar he claimed.

68. Because the verdict of the jury was adequate compensation, and the motion for an injunction should have been refused and the complaint dismissed.

69. Because his Honor erred in enjoining and restraining the defendant from operating or maintaining any of the

works described in the complaint; whereas the plaintiff, if entitled to an injunction at all, was only entitled to an order enjoining and restraining the defendant from so operating its works and business as not to inflict upon the plaintiff the injuries complained of by him.

70. Because his Honor erred in holding that he could grant an injunction against a party not before the Court, and, therefore, that part of his decree enjoining and restraining "all persons and corporations claiming under the defendant" is without authority of law, and has no binding effect.

71. Because his Honor erred in holding that, during the progress of the case, it was conceded by counsel that, pending this suit, the Brewer Mining Company had been sold out and a new company organized.

72. Because his Honor erred in adopting the verdict of the jury, and in not hearing the case and making his own findings and decree thereon.

*Mr. E. J. Kennedy*, for appellant, cites: *What causes of action may be united:* 18 S. C., 471; 35 S. C., 309; 37 S. C., 55; 30 S. C., 111; 42 S. C., 116. *Neighborhood roads:* 3 Brev., 85; 7 Rich. L., 392; 2 N. & McC., 526; 3 McC., 445, 170; 4 McC., 68; Cheves, 1; 1 McM., 47, 329; 1 Spear, 17; 1 Rich., 58; 2 Strob., 60; 5 Rich., 185; 6 Rich., 399; 7 Rich., 390; 11 Rich., 263; 11 S. C., 367; 24 S. C., 43; 5 Rich., 383; 3 S. C., 447; 1 Hill, 365; 30 S. C., 543; 46 S. C., 327; 5 S. C., 5; 29 S. C., 69; 37 N. Y., 640; 17 S. C., 416, 645; 48 Mo., 318; 73 Ind., 156. *Fish:* 3 Caines, 175; 6 A. & E. N. S., 606. *No damages unless some actual injury:* 32 S. C., 100, 592; 1 Rich. L., 444. *No damage from mere inconvenience:* 116 E. C. L., 659. *Easements:* 11 Rich., 19; 7 Allen, 277; 2 Pick., 468. *Damages by other parties and from other causes:* 15 S. C., 30. *Measure of damages:* 13 Rich., 59; 4 McC., 157; 3 McC., 548; 2 Speer, 273; 38 S. C., 289; 9 Rich., 473; 26 S. C., 259; 1 Dutch, 368; 11 Col., 61. *What may be proved under denial:* 8 S. C., 263; 38 S. C., 276; 101 N. Y., 348; 74 N. Y., 307; 41 Ind., 511; 31 Ind., 83. *Opinions not compe-*

*tent:* 36 S. C., 485; 32 S. C., 400; 26 S. C., 608; 40 S. C., 330. *When can equity be invoked:* 25 S. C., 113; 14 Rich., 154. *Equitable causes must be tried by the Court:* 6 S. C., 312; 9 S. C., 149; 11 S. C., 445; 12 S. C., 55, 108, 167; 14 S. C., 272; 16 S. C., 69. *More than mere nuisance necessary to give Court of Equity jurisdiction:* Rice, 38; 5 Metcalf, 12; 3 Jones Eq., 177; 29 Md., 188; 16 Vesey, 341; 2 Black (U. S.), 551; 64 Md., 376; 99 N. C., 15; 75 Cal., 601; 90 N. Y., 62; 8 Or., 366; 24 Fla., 106; 12 Nev., 251; 8 Minn., 113. *One not party cannot be enjoined:* 4 John Ch., 21; 7 Ves., 257. *Laches:* 1 Grant's Cas., 413; 1 N. J. Eq., 518; 1 R. I., 247; 46 Mass., 14; 20 N. J., 599; 18 Ohio St., 169. *Necessary business:* 5 Rich. L., 594; 116 Eng. Com. L. R., 609; 54 Pa. St., 171; 57 Ib., 111, 287; 70 Ib., 106.

*Mr. W. F. Stevenson,* also for appellant, cites: *Causes of action must be stated separately or must elect:* 42 S. C., 114; 37 S. C., 42. *Neighborhood roads:* 2 Strob., 60; 11 S. C., 360; 1 Hill, 367; 30 S. C., 533; 46 S. C., 327. *What can be proved under denial:* 16 S. C., 586; 10 S. C., 438; 38 S. C., 542; 8 S. C., 263. *Defendant not responsible for damages by others:* 15 S. C., 10; 26 S. C., 480; 38 S. C., 284. *Injunction against nuisance cannot be issued by Judge without trial on equity side:* 1 Bail., 1; 3 S. C., 545; 5 S. C., 412; 6 S. C., 212; 9 S. C., 148; 11 S. C., 455; 12 S. C., 108, 54, 168; 14 S. C., 272; 16 S. C., 68; 18 S. C., 232; 42 S. C., 95; 17 S. C., 425.

*Messrs. H. H. Newton, W. S. Blakeney,* and *Edward McIver,* contra, cite: *Causes of action:* 24 S. C., 42; 15 S. C., 10; 30 S. C., 111; 27 S. C., 623; 42 S. C., 96. *Election:* 37 S. C., 55; 42 S. C., 120; 38 S. C., 487; 47 S. C., 214; 17 S. C., 69; Ib., 412; 22 S. C., 479. *In private nuisances all damages may be shown whether alleged or not:* 11 Rich., 217. *Right by prescription to let loose tailings from hydraulic process is not right to let them loose from chlorinating process:* 5 Rich., 421; 4 McC., 98. *If there be different causes of*

*damage, the defendant is responsible for so much as he causes:* 42 S. C., 414. *Witness may give opinion of amount of damages:* 17 S. C., 71; 19 S. C., 66, 525; 38 S. C., 290. *Proof under general denial:* 8 S. C., 262. *Information against nuisance:* 18 S. C., 604; 8 Rich. Eq., 54; 14 S. C., 246; 42 S. C., 95. *Separate trial of equity issue not necessary unless issues sent to jury:* 9 S. C., 147; 11 S. C., 447; 12 S. C., 108.

March 31, 1897. The opinion of the Court was delivered by

MR. JUSTICE POPE. Miles Threatt, in the year 1861, settled upon a farm of ninety-eight acres of land, in the county of Chesterfield, in this State. He was a farmer, and by his efforts and skill he was enabled to support and rear a large family. Much of his dependence for raising corn and other grain was upon a piece of thirty-five or forty acres of bottom land lying on Fork Creek, near its mouth in Lynch's River. In the year 1890, his crops were not sensibly injured, but in the years 1891 and 1892, his crops were ruined, and these results he attributed to the operations of the defendant, the Brewer Mining Company, in extracting gold from the ore on the lands of said company, whose mill for that purpose was located upon what is known as Little Fork Creek, which emptied itself into Fork Creek just above the lands of plaintiff. His complaint was as follows (omitting its formal parts): "1. That he is informed and believes that the said defendant is a corporation duly chartered under and by virtue of the general laws of the State of New York, regulating the granting of such charters, and having a place of business and office, under the control and management of Emanuel Motz, as its general manager and agent, in the township of Jefferson, in the county of Chesterfield and State of South Carolina. 2. That the defendant is engaged in digging and mining gold ore at what is known as the Brewer Mine, on Little Fork Creek, a tributary of Lynch's River, and within a short distance of its mouth, where it empties into said river, in said township, and in extracting gold therefrom by various processes, in which

large quantities of water and chemicals, consisting of dele-
terious substances, the exact nature and character of which
are unknown to the plaintiff, are used and employed.    3.
That said Brewer Mine consists of a large tract or extent of
land, elevated to mountainous proportions, lying on said
Little Fork Creek, bounded by lands of plaintiff and others,
particularly bordering upon the northern side of plaintiff's
lands and lying above them on said creek, so that the nat-
ural and necessary flow of said waters from said mine is
along the lands of the plaintiff, through said creek to said
river, plaintiff's said lands consisting of a tract of ninety-
eight acres, through which said creek runs, lying below
said Brewer Mine, and being bounded by said creek, by
Lynch's River aforesaid, by lands of the estate of J. N.
Jowers, of George W. Threatt, and by said Brewer Mine
lands, and being the same whereon the plaintiff with his
family resides, and is engaged in the business of agriculture.
4. That along said Little Fork Creek, after its union with
another small stream known as Big Fork Creek, forming
the stream aforesaid, which flows continually from said
Brewer Mine along plaintiff's land to said river, the plaintiff
has large bottoms, to wit: about thirty-five acres, a part of
his tract aforesaid, which are most fertile, being yearly en-
riched by the freshets from said creeks, and yielding large
crops of grain and other produce, affording plaintiff's chief
income and support of himself and family.    That plaintiff
has been continuously in possession of said lands for more
than thirty years, and has a good legal title to the same,
and has enjoyed uninterruptedly for the whole time (except
as hereinafter stated) the privileges of water for his stock,
and other purposes, of taking fish from the creek aforesaid,
of draining his lands into said creek by means of ditches,
of having said bottoms enriched by the freshets and eddy
waters thrown back on said creek by freshets in Lynch's
River aforesaid, which deposited large quantities of vege-
table and fertilizing material upon the same, and, in addi-
tion thereto, the plaintiff has for the same time enjoyed the

use of two neighborhood roads, long since established by prescriptive right, with good, safe, and convenient fords across said creek, and has for the same time been in the enjoyment of his home upon said lands. 5. That here lately the defendant has put in large machinery, and is digging and pulverizing large quantities of the ore aforesaid, and washing from it the free gold by means of large quantities and sluices of water and certain deleterious chemicals, the names of which are unknown to the plaintiff, and has, since the first day of September, 1892, put in extensive machinery for roasting the concentrates or pulverized rock, and dissolving the same by what is known as the chlorinating processs, in which large quantities of deleterious chemicals and substances are employed and used, the exact name and nature of which are to the plaintiff unknown—all of which waters and chemicals and the detritus and tailings from the said ore are turned by defendant into said creek, and the settlings from the same are deposited along the channel of the same in such quantities as to almost fill the said channel from the said mine to the mouth, where it empties into Lynch's River aforesaid; and at each recurring swell in said creek, caused by the rains which constantly fall, the said detritus or tailings, laden with the aforesaid deleterious chemicals and substances, is carried from the said channel, by the waters which overflow the same, into the fields and bottoms of the plaintiff, and deposited over the same in quantities averaging from one inch to two feet deep; and such deposits, together with the water tainted with the chemicals and substances aforesaid, have proved destructive to part of plaintiff's said bottoms, and are fast encroaching upon the remainder, so that a part of their fertility has already been totally destroyed to such an extent that no vegetation will grow in the same, and no crop, therefore, can be produced therefrom, and the remainder is fast failing with each recurring swell or freshet in said creek. That about eight acres of said rich bottoms have thus, by the said defendant's injury to the same, been wholly de-

stroyed, in so far as the purposes of agriculture are concerned, and unless the defendant be restrained from further injury to them, the rest of said bottoms will soon likewsse be destroyed. That by the said defendant's unlawful flooding of the stream aforesaid, in the manner aforesaid, the waters thereof have been poisoned and injured so that plaintiff's stock cannot drink the same, and the fish have thereby been killed or driven from the said creek as plaintiff cannot catch any therein. The plaintiff's said roads have been obstructed and interfered with by the deposits therein of the said detritus or tailings, and at each swell or freshet the said fords become impassable, and the accumulations of said detritus or tailings are so deep that it has to be removed before communication across said stream can be effected, and the sickening stench that arises from the same on account of said chemicals and substances renders the atmosphere unpleasant and offensive, and, as plaintiff believes, unwholesome to plaintiff and his family and neighbors passing the same. A single freshet will fill plaintiff's said ditches with the said detritus or tailings cast into said creek by defendant, and plaintiff opens them or cuts more but to see the same repeated at each recurring freshet in said creek. The noxious effluvia engendered and set free in the atmosphere by the said roasting process by the defendant, at times fill plaintiff's dwelling, along with the fumes from the burning sulphurates, and makes his home unpleasant to himself and family, and the plaintiff believes that the same will, ere long, prove unwholesome and deleterious to the health of himself and family, unless this Court shall enjoin and restrain the said defendant from further operating its mill and machinery in the said processes. That plaintiff, by reason of the aforesaid acts of the defendant, by which a nuisance has been created to the land, property, habitation, privileges, rights, and easements of the plaintiff, has been damaged in the sum of $1,900, and his damages are constantly increasing by the continuous nature of the said acts of the defendant, and the results

of the same; and the defendant is threatening not only to
continue said acts and injuries, but also to increase the
capacity of its machinery, whereby the detriment of the
plaintiff will be greatly aggravated and increased.    That
plaintiff's damages are irreparable, his property is being
destroyed, and the encroachments upon plaintiff's rights
are continuous and increasing.    6. That plaintiff is advised
and believes that his legal remedies against the defendant
are wholly inadequate to obtain for him compensation for
the great injuries he has suffered, and continues to suffer,
from said acts of the defendant, and that this honorable
Court only can afford him the protection needed by the ex-
ercise of its injunction or restraining power.    Whereupon
plaintiff demands judgment: 1. That the defendant, its
agents and servants, be restrained and enjoined from further
letting loose or emptying the water, chemicals, and detritus
or tailings from its mill into said Little Fork Creek, so that
the same may be entirely free from the same, and have
only the flow of the water therein which naturally belongs
thereto, and that said defendant be further enjoined and
restrained from operating the roasting process at said mill,
whereby the fumes aforesaid are allowed to escape and befoul
the atmosphere, and make it unpleasant and unwholesome
to the plaintiff and his family and servants.    2. That the
defendant pay to the plaintiff the sum of $1,900 damages.
3. For such other and further relief as may be just."

This complaint, together with a summons, was served
upon the defendant on the 4th day of May, 1893, and the
amended answer of defendant was served on the 8th day of
June, 1893.    The effect of the answer, without repeating
its language, was to admit that the defendant was a corpo-
ration, as alleged in the complaint, but coupled with a spe-
cific denial of each fact set out in the complaint, as its first
defense.    The second defense put in issue plaintiff's title
to the land claimed by him.    Its third defense alleged that
plaintiff had adequate remedy at law.    Its fourth defense
consisted in alleging an easement to empty the tailings,

detritus, and refuse matter from its mill into Little Fork Creek.

On the 3d day of August, 1895, the defendant served upon the plaintiff the following notice: "Please take notice that the attorneys for the defense will move, on the call of this cause, for an order requiring you to elect on which cause of action you will rely in this case, on the ground that you have stated several distinct alleged causes of action all together in one paragraph of the said complaint.

The cause was called for trial before his Honor, Judge Watts, at a special term of the Court of Common Pleas for Chesterfield County, in January, 1896. The motion above noticed was called up and heard, resulting in a refusal by the Judge to grant the same. The legal issues were then tried before his Honor and a jury. The verdict was for the plaintiff, in the sum of $1,000. Afterwards a decree was pronounced granting a perpetual injunction. The defendant has appealed to this Court, on seventy-two grounds of exception. The decree and the grounds of appeal will be reported.

The first and second grounds of appeal are intended to allege error in the refusal of the Circuit Judge to grant defendant's motion to require the plaintiff to elect which one of the several causes of action set out in the complaint he would go to trial upon. No doubt exists that the Circuit Judge met this issue squarely; he decided that the complaint stated but one cause of action. Was this error? We have reproduced the entire complaint herein, so that its terms may be seen when we pass upon this issue, and this inspection clearly shows that the complaint was drawn to present but a single cause of action. The decisions of our courts in giving effect to that section of the Code of Procedure which authorizes a complaint to have two or more causes united therein, are too emphatic in requiring that each cause of action shall be stated so that it is complete in itself, without the power to draw to the support of its weakness or deficiency in state-

ment anything from a different cause of action, to have the same overlooked by a pleader of any experience. However, the intention of the pleader will not govern. After all, it resolves itself into a question of what the complaint actually alleges, whether it was one or several causes of action. Great care must always be observed to grasp the question, what right of the plaintiff has the defendant invaded? No doubt the profession will recall what obtained in the practice before the case of *Holland* v. *Kemp*, 27 S. C., 623, where a man held several notes given by a particular individual; each note was complained upon as a separate cause of action; but in the case just cited it was held that the three notes sued upon by plaintiff really constituted a single cause of action. Likewise, in the case of *Latimer* v. *Sullivan*, 30 S. C., 111, where the plaintiff had sued upon seven notes, the defendant insisted that the causes of action (treating each note as a cause of action) were insufficiently stated; but this Court held that such was not the case; that there was but one cause of action involved in the suit for the collection of these seven notes; each note was an item going to make up the cause of action. This may illustrate the case at bar. What the plaintiff in the case at bar really seeks is to prevent the defendant, through its milling operations, from invading his right of property. The injury to his bottom land is one element in this invasion of his right of property; the injury to his right to water his stock in the stream is another element; the injury to pure air at his home is another element; the injury to his fishing privilege in such stream is another element; the injury to the two neighborhood roads is another element; the injury to his ditches another element; and the injury to the air he breathes while in his bottom lands is another element. All these elements enter in to complete the alleged wrong to plaintiff by this defendant through his milling operations. The Circuit Judge evidently took this view of the complaint when he overruled this objection to it. We take the same view of this matter, and, therefore, overrule these two exceptions.

The next group of exceptions, being 3, 4, 13, 17, 40, 41, 48, and 51, relate to objections to testimony as to the injury done to the fish in the Fork Creek, as well as objections to the charge of his Honor on the subject of such alleged injury to the fish. We may be permitted to remark, that this matter of fish, so far as this testimony is concerned, is almost too trifling to be noticed. The plaintiff himself has never tried to catch a fish in this stream from 1890 to the present time, and he never saw any one else try to do so, except possibly a little boy at one time. It could not have entered into the verdict of the jury. Still, we must answer the question as to whether the plaintiff was entitled to have the stream, while running on his land, freed from refuse matter, placed in the same by defendant, that would either kill fish or cause them to stay out of the stream. We think he would have the right to force the defendant to avoid defiling the waters in such stream. Grant that he can have no property in such fish as swim in the waters, yet he has the right to have defiling matter, that will prevent fish swimming in waters running over his lands, from entering therein. Fish were accustomed to come in that stream until the year 1890, when this deleterious matter, placed in the stream by the defendant, drove them out and away, and it was an element of injury to the plaintiff. Certainly he could prove such a fact to show that the waters of the stream running over his lands had been defiled by the refuse matter discharged from defendant's milling operations. It was not competent for the defendant to show in this case by testimony of witnesses that they had seen fish in the stream after this suit was brought, for the reason that such an issue was not before the Court.

We will now dispose of the 16th and 17th exceptions. Error here alleged is that the Circuit Judge, in his charge to the jury, directed them that they need not consider the easement set up in the answer of defendant, whereby he claimed that having dumped its tailings in Little Fork Creek for twenty years, such right

was one by prescription.    We have searched the "Case" to
find if there was testimony bearing upon this alleged right
of the defendant.    There is no such testimony there.    Hence
the Judge was not in error in his charge to the jury.

We will next examine exceptions 5, 6, 7, 8, 9, 10, 11, 12,
39, 54, and 55, relating to the two neighborhood roads, which
the complaint alleged the plaintiff had the right to
use by prescription.    Neighborhood roads are pub-
lic roads.    Public roads, when interfered with by a
private person—including a corporation—subject the of-
fender to indictment.    Any private person who expects to
make another responsible to him in damages for any inter-
ference with such public road must allege that such injury
is a special injury to him.    The plaintiff did not so allege
in his complaint.    Its language referring to those neigh-
borhood roads is in paragraph 4: "And in addition thereto,
the plaintiff has for the same time" (over thirty years) "en-
joyed the use of two neighborhood roads, long since estab-
lished by prescriptive right, with good, safe, and convenient
fords across said creek;" and in paragraph 5: * * * "The
plaintiff's said roads have been obstructed and interfered
with by the deposits therein of the said detritus or tailings.
At each swell or freshet the said fords become impassable,
and the detritus or tailings are so deep that it has to be
removed before communication across said stream can be
effected." · Now, it must be apparent that every other per-
son who was compelled or desired to cross at such fords had
the same interest in the removal of such deposits as did the
plaintiff; he has not alleged in his complaint any special
injury to himself therefrom.    It seems to us, therefore, that
when the testimony was offered by the plaintiff, and it was
objected to by the defendant, on the ground that it was not
competent to prove the same on the grounds above set
forth, that the Circuit Judge should have treated such ob-
jection in the light of a demurrer to that part of the com-
plaint, because it failed to state facts sufficient to constitute
a cause of action, as was done in the case of *Wilks* v. *Walker*,

22 S. C., 108.    The writer of this opinion must be allowed
to say, that while he recognizes the law there decided as
good law, he has always felt that the manner or way in
which the question of demurrer was raised has not com-
mended itself to him as good practice.    Another decision
of this Court has since upheld the method there adopted,
and under the law I bow with great respect thereto and am
firmly bound thereby.    This matter was squarely presented
to the Circuit Judge—Judge Watts—and he refused to give
the benefit of the law to the defendant.    This itself is re-
versible error.    The authorities in our State upholding our
views in the matter of these neighborhood roads will be
found to be *Carey* v. *Brooks*, 1 Hill, 365; *Steamboat Co.* v.
*Railroad Co.*, 30 S. C., 539; *Steamboat Co.* v. *Railroad Co.*,
46 S. C., 327.

We will next consider those exceptions relating to the
different questions raised as to the damages to plaintiff's
lands as set out in the 18, 19, 20, 21, 22, 23, 25, 27, 28, 29,
30, 31, 32, 33, 34, 35, 36, 37, 38, 42, 44, 45, 47, 49, 50, 52,
56, 57, 58, 59 grounds of appeal.    We deem it best to pre-
mise our disposition of the several questions raised
by these exceptions by some observations in relation
to these alleged injuries to plaintiff's right of prop-
erty by the methods adopted by the defendant in obtaining
gold from the ore mined on its lands.    The testimony of
two of defendant's witnesses furnish this information, Mr.
Motz and Mr. McNulty.    It seems that what is known as
the Brewer Gold Mine has existed as such for many years.
At first the old methods, simple in themselves and harmless
to others, were employed for this purpose, but in 1879, a
firm, composed of Capt. Motz and his partner, a Mr. Chat-
ard, adopted for this purpose what is called by the parties
as the hydraulicing method, and in this plan a stream of
water was driven by steam through a pipe upon the soil
itself with such power as to loosen all the earth to the rock
below it.    This required a goodly stream of water, and
loosened all the soil above the rocky formation ranging

from three to thirty feet. In this way the soil covering some thirty-five acres was removed. Of course, when the gold in this soil thus removed was extracted, the tailings, as they are called, were let loose down what they call Bull Gulch, which emptied into Little Fork Creek; but to prevent this going into said creek, dams five or six in number, made of poles and brush, were constructed, which prevented much of these tailings going at once into this creek. These dams, it is claimed, from the wear and tear of time, are gradually giving way, and as a consequence the refuse matter is gradually going into the creek. But in the year 1886— early in that year—Capt. Ephraim Motz, having purchased his partner's interest in 1883, began the erection of works away from the Bull Gulch, and erected and used what is known to miners as "stamps," five in number. These stamps are heavy iron pestles, so to speak, operating very rapidly, and by their weight, and force imparted by steam pressure, crush into small particles any ore placed beneath them. As Mr. Motz says, this was an experiment on his part to demonstrate the value of this process as applied to the ore taken from this mine in obtaining gold in good quality, so that a company could be formed to operate in this territory. It was successful, so that a company known as the Brewer Mining Company was organized in the city of New York for this purpose. The operations of this company consisted in the erection of a mill with forty stamps, on the creek—Little Fork Creek—opening a tunnel, and sinking a shaft into the old Stockton quarry. On the 8th day of May, 1890, the present mill began operations. This mill ran day and night, and used each day of twenty-four hours 160 tons of ore, and this ore, by means of the forty stamps, was reduced so fine that it could pass through a wire screen having 1,600 holes to the square inch. In the year 1892, what was known as the chlorinating process was introduced into this mill's operations. This process is used about as follows: The concentrates are first roasted, so as to be freed from sulphur; then the pulp that is left after the sul-

phur is eliminated is placed in an iron barrel, lead lined, made air tight, and into that barrel, in addition to the pulp before spoken of, is placed a certain quantity of water, a certain quantity of commercially pure sulphuric acid, and a certain quantity of lime, for the chlorine it contains. The chlorine takes up all the particles of gold that is held in the "pulp." After this process, the contents of the iron barrel are dumped into a filter bed, and the chlorinate is washed with water to get the gold. The chlorine is diluted with water before it is allowed to go off into the stream. There is also found here sulphate of lime—commonly known as land plaster or gypsum. The sulphurics escaping from the chimney at the works, when it comes into contact with the air, by reuniting with the water in the atmosphere, becomes sulphuric acid, and weighing, as it does, more than air, is generally precipitated to the earth. To recur to the case at bar, there is then turned into this Little Fork Creek 160 tons of this pulverized ore, and also the waters used in the factory tinctured with chlorine, and carrying along with it, as practically insoluble, all the gypsum which has been formed. Hence, when the stream, Fork Creek, overflows its banks, it throws this chlorinated water and this gypsum on the banks or on the lands it overflows. This is increased when Lynch's River rises to the point that it practically dams up the streams that flow into it. By these means these tailings from the mill are thrown in large quantities upon plaintiff's lands. Hence his lands have lost their fertility, and the ditches are filled after every rise and freshet, which causes Fork Creek to overflow its banks. It makes no difference that there may be some sand upon the lands, but if these tailings thrown upon Mr. Threatt's lands have ruined it for agricultural purposes, by being scattered over eight acres thereof, so that nothing will grow thereon, and also that his ditches are so often filled that his other lands included in his bottoms are rendered unfit for cultivation, of course this defendant should pay the damages thereby occasioned him. The defendant,

through its superintendent, recognizes the fact that he was
injuring the plaintiff, as witness his anxiety to buy his land,
or to settle the damages by conveying to him additional
lands in settlement of such injuries. Especially to Mr.
Motz's credit, it should be stated that he wished the plain-
tiff to authorize him to build a dam to catch these tailings;
but the plaintiff would not authorize this to be done.    Of
course, the defendant is only responsible for the damages
it causes, and so we understand the Circuit Judge to have
ruled; but this plaintiff is entitled to have the defendant to
pay him damages for thus ruining, for the time, at any
rate, of his fertile bottoms.  In the measure of the damages
to . the plaintiff for the injuries to his thirty-five acres of
bottom lands, the jury should be limited, in ascertaining
his damages, to the difference in the value of the lands
from 8th May, 1890, to the date plaintiff brought his suit.
But in the assessment of his damages from having a tainted—
bad smelling—deposit thrown upon his bottom lands and
in his ditches, they (the jury) are not limited to the actual
injury in the market value of those lands from 8th May,
1890, to the date in May, 1893, when the suit was brought;
but they may find a reasonable, just compensation by way
of damages to the plaintiff for this matter.  This deposit
has a threefold injury—first, it destroys the fertility of the
lands; second, by filling up the ditches, it causes water to
stand upon other parts of the land; and, third, the deposits
exhale noxious odors.  For the first and second injuries,
the verdict must be limited to the depreciation in the mar-
ket value caused by the deposits from 8th May, 1890, to
May, 1893.  As to the third, the jury must estimate in
dollars and cents what the bad odors from these deposits,
between the same dates, may have damaged the plaintiff,
if any such damage has occurred.  But, of course, damages
from every quarter to the plaintiff, as set out in his com-
plaint and proved by the testimony, must not exceed the
amount—$1,900—claimed in the complaint.

Next, as to the fumes wafted from defendant's works to

plaintiff's dwelling, according to the testimony, for the plaintiff so testified, this was an inconvenience felt only once. We do not think it worth while to bestow any pains upon consideration of such a question. At a distance of a mile or a mile and a half from the plaintiff's residence, the gases from the defendant's chimney, being merely sulphurous, could scarcely have worked any material injury. This was a matter for the proof, however. Our only right to consider the testimony in this case comes from the fact that in one respect it was a case in equity as well as at law; in the class of cases that are equitable we can consider the testimony, while in cases in law we cannot.

Lastly, as to those grounds of appeal which imputes error to the Judge sitting as a Chancellor. We will frankly state that if there had not been reversible error in the trial on the law side, we would not have considered that the Judge erred in the matter of jurisdiction on the equity side of the court. Under the statements in the "Case," presented for the hearing of this appeal, it seems to us that the Circuit Judge was right. The defendant did not set up any equitable defense in its answer. The scope of the complaint clearly shows that the aid of equity was only invoked to prevent the recurrence from day to day of the injuries from which, up to the filing of the complaint, he asked damages. This is a good ground for equity to interpose for plaintiff's protection, if a jury have established the existence of the nuisance, as the jury did in this case. We will remark, however, that we have not gone in this opinion into all the matters mentioned in the exceptions, after we became satisfied that there was reversible error, as fully as we might, because the same questions may not occur again—we mean at the next trial.

It is the judgment of this Court, that the judgment and decree appealed from be reversed, and that the cause be remitted to the Circuit Court for the purpose of a new trial.